## CASE NO. 15-3491

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

———————————

ELLIOTT J. SCHUCHARDT, individually and
doing business as the Schuchardt Law Firm,

Appellant,

v.

BARACK OBAMA, as President of
the United States, et al.,

Appellees.

———————————

Appeal from the Order dated September 30, 2015 of the
Honorable Cathy Bissoon of the United States District Court for
the Western District of Pennsylvania in Case No. 2:14-cv-00705-CB.

———————————

## APPELLANT'S BRIEF

———————————

Filed on behalf of the Appellant,
Elliott J. Schuchardt

<u>Contact information for this party</u>:

Elliott J. Schuchardt
Schuchardt Law Firm
309 Braeburn Drive
Winchester, VA 22601
Phone: (540) 409-8993
E-mail: elliott016@gmail.com

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. I

JURISDICTIONAL STATEMENT ....................................................1

STANDARD OF REVIEW .................................................................2

STATEMENT OF RELATED CASES AND PROCEEDINGS ...............2

STATEMENT OF CASE ....................................................................3

PROCEDURAL BACKGROUND .....................................................14

SUMMARY OF ARGUMENT .........................................................16

ARGUMENT ..................................................................................19

I.      The executive branch is infringing on the investigatory function of this Court. ...................................................................................19

II.     Defendants' collection of e-mail is in direct violation of the Fourth Amendment. ............................................................................22

     A.    The Plaintiff has an expectation of privacy in his e-mail and web search queries. ...................................................................22

     B.    Defendants' conduct is an impermissible "general warrant." ..............24

     C.    Defendants are incapable – by definition – of policing their own behavior. ......................................................................26

     D.    The government's vast collection program is *per se* is unreasonable under the Fourth Amendment. ......................................29

III.    The Plaintiff has standing under federal case law because he has been specifically injured by Defendants' conduct. ....................................31

     A.    Three federal circuit courts have held that plaintiffs have standing in collection cases, such as this case. ...................................32

         1)    Ninth Circuit ...................................................................32

         2)    Second Circuit ..................................................................33

3)    D.C. Circuit. ...........................................................................34

    B.    The trial court erred in its interpretation of the above cases................36

    C.    The complaint properly pleads injury caused by Defendants'
           unauthorized seizure of e-mail and web search queries. ....................38

IV.    It is proper for the Court to grant a preliminary injunction. ..........................41

    A.    The Plaintiff is likely to succeed on the merits....................................42

         1.    The Defendants' program directly violates the Fourth
               Amendment of the U.S. Constitution. ........................................43

         2.    The Defendants' program directly violates the First
               Amendment of the U.S. Constitution. ........................................43

         3.    The Defendants' collection program is not authorized
               under Section 215 of the Patriot Act. ........................................45

    B.    The Plaintiff will suffer irreparable harm if preliminary relief is
           withheld. ...............................................................................................48

    C.    Issuance of a preliminary injunction will *not* substantially injure
           the Defendants. ......................................................................................50

    D.    The balance of harm and the public interest supports the grant of
           a preliminary injunction..........................................................................51

CONCLUSION .....................................................................................................52

CERTIFICATE OF COMPLIANCE ........................................................................1

APPENDIX – VOLUME I .......................................................................................1

CERTIFICATE OF SERVICE .................................................................................1

# TABLE OF AUTHORITIES

**Cases**

ACLU v. Clapper, 959 F. Supp. 2d 724, 738, 2013 U.S. Dist. LEXIS
    180863, 29, 2013 WL 6819708 (S.D.N.Y. 2013)................................33

Allegheny Energy, Inc. v. DQE, Inc., 171 F.3d 153, 158 (3d Cir. 1999). ..............41

Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 2009 U.S.
    LEXIS 3472, 28-29 (2009) ......................................................32

Bates v. City of Little Rock, 361 U.S. 516 (1960)....................................44

Bell Atlantic v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1965, 167 L. Ed.
    2d 929, 940, 2007 U.S. LEXIS 5901 (2007). .....................................31

Bennett v. Spear, 520 U.S. 154, 167, 137 L. Ed. 2d 281, 117 S. Ct. 1154
    (1997)........................................................................31

Berger v. New York, 388 U.S. 41 (1967). .............................................29

Boumediene v. Bush, 553 U.S. 723, 742, 128 S. Ct. 2229, 2246 (2008)................19

Brigham City v. Stuart, 547 U.S. 398 (2006)..........................................29

Buckley v. Valeo, 424 U.S. 1 (1976) .................................................44

Checkpoint Sys., Inc. v. Check Point Software Techs., Inc., 269 F.3d 270,
    280 (3d Cir. 2001)............................................................41

CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 739, 747
    (D.C. Cir. 1995) .............................................................42

Clapper v. Amnesty Int'l USA, 133 S. Ct. 1138, 1140; 185 L. Ed. 2d 264,
    269; 2013 U.S. LEXIS 1858, *4 (2013). .......................................31

Clark v. Library of Cong., 750 F. 2d 89 (D.C. Cir. 1984..............................44

Clinton v. City of New York, 524 U.S. 417, 450, 118 S. Ct. 2091 (1998).............21

Cortez III Serv. Corp. v. Nat'l Aeronautics & Space Admin., 950 F. Supp.
    357 (D.D.C. 1996) ...........................................................52

Elrod v. Burns, 427 U.S. 346 (1976)........................................................44

Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 476 & n.11 (3d
    Cir. 1994). ...................................................................................42

Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 173 (3d Cir.
    2001). .........................................................................................42

Hohe v. Casey, 868 F.2d 69, 72 (3d Cir. 1989) (quoting Elrod v. Burns, 427
    U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976)....................48

In re Grand Jury Proceedings, 776 F.2d 1099 (2d Cir. 1984)................44

In re Medicare Reimbursement Litigation, 414 F.3d 7 (D.C. Cir. 2005)................51

In Re Production of Tangible Things [Redacted], Dkt. No: BR. 08-13 (FISA
    Ct. March 2, 2009). .....................................................................28

In re Redacted Government Case, FISA Court, Opinion of Roger Vinson ...............5

Int'l Dairy Foods Ass'n v. Amestoy, 92 F.3d 67, 71 (2d Cir. 1996)......................48

Jacksonville Port Auth. V. Adonis, 556 F.2d 52 (D.C. Cir. 1977). .........................51

Klayman v. Obama, 957 F. Supp. 2d 1, 2013 U.S. Dist. LEXIS 176925, 2013
    WL 6571596 (D.D.C. 2013) .......................................................34, 35

Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 708, 2004 U.S. App.
    LEXIS 10165, 15, 70 U.S.P.Q.2D (BNA) 1874 (3d Cir. 2004) ......................41

Marbury v. Madison, 5 U.S. 137 (1803) ....................................................19, 20, 21

Marbury v. Madison, 5 U.S. 137, 177, 2 L. Ed. 60, 73, 1803 U.S. LEXIS
    352, 70-71, 1 Cranch 137 (1803) ........................................................46

N. Mariana Islands v. United States, 686 F. Supp. 2d 7 (D.D.C. 2009) .................52

NAACP v. Alabama ex rel. Patterson, 357 U.S. 449 (1958) ...................................44

Obama v. Klayman, 800 F.3d 559, 2015 U.S. App. LEXIS 15189 (D.C. Cir.
    2015) ...........................................................................................35

O'Donnell Const. Co. v. District of Columbia, 963 F.2d 420 (D.C. Cir. 1992).......51

Riley v. California, 134 S. Ct. 2473, 189 L. Ed. 2d 430, 2014 U.S. LEXIS
    4497 (2014) ........................................................22, 23

Samson v. California, 547 U.S. 843 (2006) ...........................................30

Seretse-Khama v. Ashcroft, 215 F. Supp. 2d 37, 53 (D.D.C. 2002).................49, 51

Singer Mgmt. Consultants, Inc. v. Milgram, 650 F.3d 223, 229 (3d Cir. 2011)......42

United States v. Banks, 540 U.S. 31, 36, (2003).....................................47

United States v. Henley, 469 U.S. 221, 227 (1985). ...............................47

United States v. Mitchell, 377 F. Supp. 1326, 1974 U.S. Dist. LEXIS 8455
    (D.D.C. 1974) ...................................................20, 21

United States v. Nixon, 418 U.S. 683 (1974)......................................16, 19

Virginia v. Moore, 553 U.S. 164 (2008) ...............................................30

Warden, Maryland Penitentiary v. Hayden, 387 U.S. 294, 313-314, 87 S. Ct.
    1642, 1653-1654, 18 L. Ed. 2d 782, 796, 1967 U.S. LEXIS 2753, 34
    (U.S. 1967)......................................................25

**Statutes**

11 U.S.C. § 101(10A). ...............................................................2

28 U.S.C. § 1291 (2015) ............................................................1

28 U.S.C. § 1331 (2015) ............................................................1

50 U.S.C. § 1860 (2015) ............................................................46

**Other Authorities**

3 Elliot's Debates 448-449.........................................................25

**Rules**

F.R. App. P. 4(a)(1)(A) (2015). ...................................................1

iii

Fed. R. Civ. P. 8(a)(2) (2014) ...................................................................31

**Treatises**

11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal
Practice and Procedure § 2948.1 (2d ed. 1995). ................................49

**Constitutional Provisions**

U.S. Const. 4th Amend. (2015) ................................................................22

U.S. Const., Art. III, Sect. 1 (2014). ......................................................20

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because the case involves questions of the United States Constitution and federal law.

This Court has jurisdiction over the case pursuant to 28 U.S.C. § 1291. Section 1291 states that the "courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States." Id.

This appeal is from a final judgment that disposes of all parties' claims. Such order was entered by the District Court on September 30, 2015. (R. 8).

Finally, the appeal in this case is timely. According to Rule 4(a)(1)(A) of the Federal Rules of Appellate Procedure, an appeal is timely if the appellant files a notice of appeal with the District Court within thirty days of entry of the appealed order. The Appellant, Elliott Schuchardt, filed his notice of appeal with the District Court on October 14, 2015 – within the thirty-day appeal period. (R. 20).

## STATEMENT OF ISSUES

1)    Whether the District Court erred when it ruled that Schuchardt does not have standing in this case.

2)    Whether the District Court erred when it denied Schuchardt's motion for a preliminary injunction.

## STANDARD OF REVIEW

This case involves solely questions of law.  Such issues are reviewed on a plenary, or *de novo*, standard.  United States v. Walker, 473 F.3d 71, 75 (3d Cir. 2007); Delaware County v. Fed. Hous. Fin. Agency, 747 F.3d 215, 2014 U.S. App. LEXIS 5030, 2014 WL 1012961 (3d Cir. Pa. 2014).

## STATEMENT OF RELATED CASES
## AND PROCEEDINGS

This case has not been previously heard by this Court.  There are no other related cases or proceedings involving these parties, pending in this or any other court.

## STATEMENT OF CASE

This case challenges the Defendants' collection and analysis of e-mail in the United States without a warrant.  The facts of the case are well established.

On October 4, 2001, President George W. Bush authorized the National Security Agency ("NSA") to intercept, access and electronically store ("collect") the full content of e-mail passing through certain United States communication facilities.  The program, called Stellar Wind, was not disclosed to the general public.  (App. 79, 138).[1]

In December 2005, the New York Times published an article about the program, exposing it for the first time.  (App. 139).  A few months later, in May 2006, an AT&T technician revealed that the NSA was copying all e-mail passing through an AT&T communication facility in San Francisco.  Id.

Following these disclosures, the government sought to establish the legality of the Stellar Wind program through the Foreign Intelligence Surveillance Court  (the "FISC").  The FISC is a court established pursuant to the Foreign Intelligence Surveillance Act, 50 U.S.C. chap. 36 ("FISA").  (App. 139.)

On December 13, 2006, the U.S. Department of Justice filed an application with the FISC for approval of the Stellar Wind program.  The application asked the FISC to give the government blanket authority to collect all e-mail passing through specific

---

[1] This brief will refer to the Appendix as "App. ___."

communication facilities. Once collected, the e-mail could be searched with approval of the Attorney General, but not a court. (App. 139).

On January 10, 2007, the Honorable Malcolm J. Howard, a judge with the FISC, preliminarily approved the government's petition. (App. 140).

Shortly thereafter, then-Attorney General Alberto Gonzales crowed to the media that the warrantless spying program had been brought "under the authority of the FISC." He described the administration's legal theory as "innovative" and "complex." (App. 140-41).

However, Gonzales spoke too soon. On March 21, 2007, the government filed an application to renew the bulk collection authority approved by Judge Howard. This time, the FISC *denied* the application. (App. 141). In an opinion written on April 3, 2007, Judge Roger Vinson held that the government's bulk collection of e-mail was *not* authorized by the Foreign Intelligence Surveillance Act. (App. 141).

In denying the government's request, Judge Vinson explained his reasoning as follows:

> Congress intended the pre-surveillance "judicial warrant procedure," and particularly the judge's probable cause findings, to provide an external check on executive branch decisions to conduct surveillance.

> Contrary to this intent of Congress, the probable cause inquiry proposed by the government could not possibly restrain executive branch decisions to direct surveillance at any particular individual, telephone number or e-mail address.

4

* * *

> The government would have all the probable cause findings . . .
> made _by executive branch officials_, subject to after-the-fact
> reporting to the Court.  That result cannot be squared with the
> statutory purpose of providing a pre-surveillance "external check"
> on surveillance decisions.

(App. 141, 180-81).   Judge Vinson therefore ordered the government to cease

collecting e-mail as of May 31, 2007.  (App. 141, 187).

Before finishing his opinion, however, Judge Vinson addressed the

government's argument that the President can collect the nation's e-mail under his

powers as Commander in Chief of the armed forces.  Vinson addressed this argument

as follows:

> I recognize that the government maintains that the President may
> have "constitutional or statutory authority to conduct the electronic
> surveillance detailed herein _without Court authorization_."
> [Citations omitted].  **Nothing in this order and opinion is
> intended to address the existence or scope of such authority, or
> this Court's jurisdiction over such matters**.

(App. 142, 186) (emphasis added).

In other words, the FISC indicated that it would "look the other way" if the President

sought to collect the nation's e-mail under the President's alleged powers as

Commander in Chief.  In making this statement, Vinson gave the Defendants a green

light to collect the nation's e-mail database, without further involvement of – or

oversight from – the FISC.  That is exactly what Defendants did.

During the summer of 2007, Defendants began to ramp up the most massive invasion of privacy ever seen in the history of the world.  Their goal was then -- and is now -- to intercept and store all online documents and communications.  This includes all documents sent by e-mail, as well as documents stored in cloud service providers, such as Dropbox or Microsoft's Sky Drive.

Defendants' systematic collection got underway on the sixth anniversary of the 911 attacks:  On September 11, 2007, Defendants began bulk collection of e-mail sent by means of Microsoft's system.  On March 12, 2008, the Defendants began bulk collection of Yahoo e-mail and web search queries.  Other providers followed:  Google on January 14, 2009; Facebook on June 3, 2009; YouTube on September 24, 2010; Skype on February 6, 2011; AOL on March 31, 2012; Apple in October 2012; and Dropbox in June 2013.  (App. 84-84, 95-96).

**Binney disclosures**

During the past fifteen years, a number of persons from the intelligence community have come forward to warn the American people of the dangers of Defendants' conduct.

One of the first critics was William E. Binney, a senior employee of the NSA. Over the course of his 31-year career, Binney mentored the technical work of approximately 6,000 employees at the NSA.  (App. 118).  In late 2001, Binney resigned from the agency after he learned that the NSA had started collecting the full content of domestic e-mail, without a warrant.  (App. 79).

On July 2, 2012, Binney made the following statement in an Affidavit, filed in this case:

> [In late 2001,] the NSA began to implement the . . . President's Surveillance Program ("PSP").  [M]embers of my . . . team were given the task of implementing various aspects of the PSP.  <u>They confided in me and told me that the PSP involved the collection of domestic electronic communications traffic without any of the privacy protections built into [the former program]</u>.
>
> I resigned from the NSA in late 2001.  I could not stay after the NSA began purposefully violating the Constitution.

(App. 80-81, 108) (emphasis added).

Other former-NSA employees back up Binney's allegations.  Thomas Drake, a former employee of the agency with 29 years of experience, states as follows:

> Various employees who were implementing . . . aspects of the PSP confided in me and told me that the PSP involved the collection of

domestic electronic communications traffic without any privacy
protections or judicial oversight.

\* \* \*

[The NSA] has, or is in the process of obtaining, the capability to
seize and store most electronic communications passing through its
U.S. intercept centers. The wholesale collection of data allows the
NSA to identify and analyze Entities or Communities of Interest
later in a static database.

\* \* \*

The data is searchable and available. <u>There is no effective
technical oversight by Congress or the courts</u>. It is seductively
enticing to ignore the law.

(App. 81, 118-19) (emphasis added).

Kirk Wiebe, a third former employee of the NSA, has made the following

statement in an affidavit filed in this case:

I agree with the analysis and conclusions set forth in Mr. Binney's
declaration. . . . Like Mr. Binney, I have concluded that . . . the
NSA has chosen to seize and save all electronic communications.

(App. 81, 126). Thus, according to the NSA's own employees, the agency is collecting

the full content of the nation's e-mail without a warrant.

**Snowden disclosures**

In June 2013, another member of the intelligence community came forward.

That person was Edward Snowden. (App. 82).

Snowden is a former system administrator for the Central Intelligence Agency

("CIA") and a counterintelligence trainer at the Defense Intelligence Agency ("DIA").

He later worked for the consulting firm, Booz Allen Hamilton, inside an NSA center located in Hawaii.  In these positions, Snowden worked directly with the Chief Information Officer at the CIA to solve the agency's technology problems.  Thus, like "Deepthroat" in the Watergate scandal, Snowden was a senior government employee with knowledge of what was going on.  (App. 82).

While working for the Defendants, Snowden learned that the Defendants were collecting the full content of substantially all of e-mail sent by American citizens by means of several large internet service providers.  (App. 82).

In early 2013, Snowden approached several reporters to disclose his discovery. The information he provided led to a series of articles published in the *Guardian* and *Washington Post* newspapers.  (App. 83).

On June 5, 2013, the *Guardian* published an article stating that the government was collecting "call detail records" for calls made wholly in the United States.[2]  The article published an order obtained from the Foreign Intelligence Surveillance Court directing Verizon Business Network Services, Inc. ("Verizon") to disclose all domestic call detail records to the NSA.  (App. 48-51). Defendants subsequently admitted that the order was valid, and declassified the program.  (App. 84).

---

[2] Unlike e-mail, this collection was being done under the supervision of the Foreign Intelligence Surveillance Court.  (App. 43-47, 83).

The following day, on June 6, 2013, the *Guardian* published a second article, which reported that Defendants had obtained direct access to the servers of several large internet companies, including Yahoo, Google, Facebook, Twitter, Dropbox, and Apple. This program is known as "Prism."    (App. 52-58, 83).

Both articles are based on documents provided by Edward Snowden. Such documents show that Defendants are collecting *all e-mail* sent by means of certain internet companies based in the United States. This includes e-mail sent by means of Microsoft, Yahoo, Google, Facebook, PalTalk, AOL, Skype, YouTube and Apple. The documents also show that Defendants are collecting all documents stored by means of certain cloud service providers, such as Dropbox and Microsoft's Skydrive. (App. 59-60, 84-85).

For example, one document is labeled "New Collection Posture." It says: "Sniff It All, Know It All, **Collect It All**, Process It All." (App. 61, 85). Another document boasts that the Defendants are "one step closer to **collecting it all**." (App. 62, 85).

Defendants are literally storing every single document stored on Microsoft's Skydrive -- a cloud service. For example, one document states as follows:

> Beginning on 7 March 2013, PRISM now collects Microsoft Skydrive data as part of PRISM's standard Stored Communications collection package. . . .   This means that analysts will no longer have to make a special request to SSO for this -- a process step that many analysts may not have known about. This success is the result of the FBI working for many months with Microsoft to get this tasking and collection solution established. "Skydrive is a

cloud service that allows users to store and access their files on a variety of devices."

(App. 63, 85-86).

Defendants' collection efforts have become so massive that the Defendants are having difficulty processing all of the data. According to one document obtained from Snowden: "Collection is outpacing [the Defendants'] ability to ingest, process and store to the 'norms' to which [they] have become accustomed." (App. 64, 86).

Any doubt about the meaning of these documents is resolved by the statements made by Snowden, himself. During a video interview published by the *Guardian*, on June 10, 2013, Snowden stated:

> **I, sitting at my desk, could wiretap anyone, from you or your accountant, to a federal judge** or even the president, if I had a personal e-mail.

(App. 66, 86) (emphasis added).

One month later, on July 12, 2013, Snowden released a statement during a press conference. The first paragraph of the statement read as follows:

> Hello. My name is Edward Snowden. A little over a month ago, I had a family, a home in paradise, and I lived in great comfort. I also had the capability, without a warrant, to search for, seize, and read your communications. Anyone's communications at any time. That is the power to change people's fates. It's also a serious violation of the law, the 4th and 5th Amendments to the Constitution of my country.

(App. 67-68, 86).

The above statements are astonishing, and indicate a massive breach on the part of the Defendants of the public trust, as well as a violation of United States law.

Following Snowden's disclosures, Defendants claimed that they were only storing "metadata," and not the actual content of electronic documents and communications.  Metadata refers to certain information relating to a specific telephone call or e-mail.  It includes the date and time of the communication; the sender; and the recipient of the call or e-mail.  However, it would not include the content of the e-mail or phone call.  For the past two years, Defendants have claimed that their collection was about relatively-benign "metadata," and not about content.

Snowden responded to the government's "spin" in March 2014, when he appeared at a TED conference in Vancouver, Canada by means of video conference. During that appearance, Snowden said the following:

> The best way to understand PRISM . . . is to first talk about what PRISM *isn't*. Much of the debate in the U.S. has been about metadata. They've said it's just metadata, it's just metadata . . . . *PRISM is about content*.

(App. 87).

More recently, extended interviews with Snowden have appeared in Laura Poitras' film, *CitizenFour*.  In that film, Snowden states directly that the Defendants are collecting the *full content* of Americans' e-mail, without a warrant or any sort of court supervision.  Id.

12

Snowden has therefore confirmed the allegations of earlier whistleblowers, Binney, Drake and Wiebe.

## **Lavabit Disclosures**

Prior to June 2013, Edward Snowden used an encrypted e-mail service called "Lavabit."  Defendants could collect e-mail sent by Lavabit by tapping into cables proximately located near the company's servers.  However, they could not read Snowden's actual e-mail because Lavabit uses encryption codes – or strings of numbers -- that are too long to be cracked by today's supercomputers.  To access the content of the e-mail, Defendants needed the actual encryption codes.

Following Snowden's disclosures, Defendants approached Lavabit and demanded that it install a device on its server which would have provided Defendants with access to the full content of all e-mail messages for all of Lavabit's 410,000 customers, an extraordinary – and patently illegal – request.  (App. 70-71, 87).  Defendants also demanded that the company's owner, Ladar Levinson, provide to the government the private encryption keys for all of Lavabit's e-mail accounts.  Id.

On August 8, 2013, Levinson voluntarily shut down Lavabit, because he could no longer provide a secure e-mail service to his customers.  Id.

The following day, on August 9, 2013, another e-mail service -- Silent Circle -- voluntarily shut down operations.  After doing so, Silent Circle destroyed its e-mail

server so that its database of e-mail communications would not fall into Defendants' hands.  (App. 88).

Since August 9, 2013, there has been no secure e-mail service within the United States.  The content of all e-mail sent or passing through the United States is monitored and stored by Defendants, without a warrant or any form of court supervision.  (App. 88).

## PROCEDURAL BACKGROUND

The Plaintiff, Elliott Schuchardt, is an attorney with an office in Winchester, Virginia.  Schuchardt has practiced law for more than twenty years.  (App. 189).

Schuchardt is a consumer of many of the internet services described above.  He uses e-mail provided by Google, Facebook and Yahoo; he conducts web searches through the Google search engine; and he stores his personal and law firm documents by means of the Dropbox cloud storage service.  Finally, Schuchardt makes telephone calls by means of Verizon Communications.  (App. 95, 189-90).

As a lawyer, Schuchardt is required to keep his communications with clients confidential.  He is not able to do so if the Defendants are actively intercepting and storing his e-mail and online documents.

On June 2, 2014, Schuchardt filed a complaint against the Defendants, seeking an injunction. Schuchardt subsequently amended the complaint on September 2 and November 24, 2014. (App. 22, 77).

On December 11, 2014, the Defendants filed a motion to dismiss Schuchardt's second amended complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (App. 6).

On January 7, 2015, Schuchardt filed a motion for a preliminary injunction. The District Court denied the motion shortly thereafter. (App. 6).

On September 30, 2015, the District Court entered an order dismissing the case, after finding that Schuchardt does not have standing to raise the issues set forth in the complaint. (App. 8-19).

On October 14, 2015, Schuchardt appealed to this Court. (App. 20).

## SUMMARY OF ARGUMENT

For the first time in history, a small group of persons within the federal government has gained access to virtually all online communications and documents. This includes e-mail sent by all American internet companies, as well as documents stored online by means of cloud service providers.

Defendants are collecting these documents *without any sort of court oversight*. The federal courts are not involved; nor is the Foreign Intelligence Surveillance Court. Defendants are engaging in this massive invasion of privacy under the President's alleged authority as Commander in Chief of the armed forces.

However, the President's power to make war is not unchecked.  Seventy years ago, during the Korean War, President Truman tried to use the war power to seize control of the nation's steel mills.   The federal courts vetoed that idea.   See Youngstown Sheet & Tube Co. v. Sawyer, 103 F. Supp. 569, 1952 U.S. Dist. LEXIS 4527 (D.D.C. 1952).   Fifty years ago, President Nixon sought to use executive authority to hide evidence of political wiretapping.  The federal courts placed limits on that idea, as well.  See United States v. Nixon, 418 U.S. 683 (1974).

We are now facing an even more pernicious and dangerous invocation of executive authority.  By unilaterally seizing the nation's e-mail database, the executive branch is infringing on the investigatory function of this Court, in violation of the

separation of powers doctrine in the Constitution. Defendants are also massively violating the Fourth Amendment of the Constitution.

It is impossible to understate the ramifications – and danger – of Defendants' conduct. The small group of persons with access to the nation's electronic writings will inevitably use this power for personal gain. First, it will be used by staffers to spy on former lovers. Then, more sophisticated persons will spy on Wall Street, for insider trading purposes. Eventually – and with certainty – the power will be used to spy on political opponents, to steal trade secrets, or for blackmail.

The purpose of this lawsuit is *not* quixotic. <u>The purpose of this lawsuit is to gently nudge Defendants' current, unstable system in the direction of a more-secure, stable platform</u>.

This can be done *without* jeopardizing the nation's security. It can be done <u>by requiring the nation's internet service providers to keep e-mail for a certain number of years, and by allowing Defendants to search such e-mail – in real time – under the supervision of a court</u>. Under no circumstances should Defendants have possession of the nation's e-mail database. The key to the kingdom must be held by a third party, namely the courts.

Not coincidentally, this is the same solution adopted by John Adams when he drafted the Fourth Amendment two centuries ago. At that time, Adams was dealing with a similar problem of government intrusion. The problem came in the form of

"general warrants" issued by British colonial officials. A general warrant allowed a police officer to search *anywhere*, without any degree of specificity. Naturally, general warrants led to a great deal of abuse, and were banned by the Fourth Amendment.

The present system of allowing the executive branch to seize and review all online content is the equivalent of a general warrant. It will lead to abuse – if not now – then *foreseeably* down the road.

The federal courts appear to be inclined to enforce the original framework of the founders. In the past four years, **no less than three federal circuit courts have found that plaintiffs have <u>standing</u> to sue in government collection cases**. <u>See</u> <u>Jewel v. NSA</u>, 673 F.3d 902, 2011 U.S. App. LEXIS 25951 (9th Cir. 2011); <u>ACLU v. Clapper</u>, 785 F.3d 787, *801; 2015 U.S. App. LEXIS 7531, **27 (2d Cir. 2014); <u>Obama v. Klayman</u>, 800 F.3d 559, 2015 U.S. App. LEXIS 15189 (D.C. Cir. 2015).

Standing exists in this case, as well, because the Plaintiff has articulated concrete facts demonstrating that he has been injured by Defendants' conduct. The Plaintiff is a civil liberties lawyer, who has a genuine need to prevent government opponents from accessing his documents without a warrant.

It is time to gently – and peaceably – move this system back towards a stable platform, that will enable the Republic to survive for another two centuries.

## ARGUMENT

## I.    The executive branch is infringing on the investigatory function of this Court.

In 1803, in Marbury v. Madison, 5 U.S. 137 (1803), the U.S. Supreme Court stated that it has the power to issue orders binding upon the executive branch of the United States.

Since that time, the Supreme Court has jealously guarded the power of the federal courts, vis-a-vis the executive branch.  See, e.g., Youngstown Sheet & Tube Co. v. Sawyer, 103 F. Supp. 569, 1952 U.S. Dist. LEXIS 4527 (D.D.C. 1952) (president does not have the power to seize nation's steel mills under his alleged power as commander in chief of the armed forces); United States v. Nixon, 418 U.S. 683 (1974) (president does not have the power to determine the scope of a subpoena issued by a federal court); see also Boumediene v. Bush, 553 U.S. 723, 742, 128 S. Ct. 2229, 2246 (2008) ("The Framers' inherent distrust of governmental power was the driving force behind the constitutional plan that allocated powers among three independent branches.").

In this case, the executive branch is attempting to usurp the Court's investigatory function.  This function was assigned to the federal courts by Article III of the U.S. Constitution.  Specifically, that section provides as follows:

> The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.

U.S. Const., Art. III, Sect. 1 (2014).

By unilaterally seizing the nation's e-mail and searching it without a court order, the Defendants have rendered moot the need for this Court to review and issue subpoenas.

The judicial power of the United States cannot be shared with other branches of the federal government. In 1974, the U.S. Supreme Court addressed this issue in United States v. Nixon, 418 U.S. 683, 704-705, 94 S. Ct. 3090, 3106, 41 L. Ed. 2d 1039, 1062, 1974 U.S. LEXIS 93, 40-41 (U.S. 1974).

In that case, the U.S. District Court for the District of Columbia issued a subpoena to President Nixon, directing him to produce audio recordings of conversations that occurred in the Oval Office. Nixon moved to quash the subpoena, arguing that production would have violated "executive privilege." The District Court denied Nixon's motion, finding that the federal courts -- and not the President -- are the final arbiter of the law. United States v. Mitchell, 377 F. Supp. 1326, 1974 U.S. Dist. LEXIS 8455 (D.D.C. 1974) (Sirica, J).

On appeal, the U.S. Supreme Court unanimously affirmed Judge Sirica. The Court explained its reasoning as follows:

20

Our system of government "requires that federal courts on occasion interpret the Constitution in a manner at variance with the construction given the document by another branch."

\* \* \*

The "judicial Power of the United States" . . . can no more be shared with the Executive Branch than the Chief Executive, for example, can share with the Judiciary the veto power. . . . Any other conclusion would be contrary to the basic concept of separation of powers and the checks and balances that flow from the scheme of a tripartite government. The Federalist, No. 47, p. 313 (S. Mittell ed. 1938).  We therefore reaffirm that it is the province and duty of this Court "to say what the law is" with respect to the claim of privilege presented in this case. Marbury v. Madison, supra, at 177.

Nixon, 418 U.S. at 704-705, 94 S. Ct. at 3106, 1974 U.S. LEXIS 93, 40-41 (U.S. 1974).

The seizure of online documents in this case is far more pernicious than the facts of the Nixon case.  In Nixon, the executive branch was wiretapping the political opposition.  In this case, the executive branch is essentially wiretapping the entire nation, including the Court itself.  (App. 86).

For the foregoing reasons, the executive branch is attempting to seize the Court's power.  The Plaintiff respectfully submits that the Court enforce its powers, while it has the ability to do so.  Clinton v. City of New York, 524 U.S. 417, 450, 118 S. Ct. 2091 (1998) (Kennedy, J., concurring) ("Liberty is always at stake when one or more of the branches seek to transgress the separation of powers").

21

## II.   Defendants' collection of e-mail is in direct violation of the Fourth Amendment.

Defendants' conduct is a direct violation of the Fourth Amendment of the United States Constitution.  Such amendment reads:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. 4th Amend. (2015) (emphasis added).

The protection of the Fourth Amendment only applies if Plaintiff Schuchardt has an expectation of privacy in the information sought by the government.  In this case, Schuchardt – and his law firm clients – do have an expectation of privacy.

### A.   The Plaintiff has an expectation of privacy in his e-mail and web search queries.

In 2014, the U.S. Supreme Court issued a landmark opinion clarifying that the Plaintiff has an expectation of privacy in his e-mail, texts and web search queries.

In Riley v. California, 134 S. Ct. 2473, 189 L. Ed. 2d 430, 2014 U.S. LEXIS 4497 (2014), the state of California searched the defendant's cell phone without obtaining a warrant.  The defendant, David Riley, then moved to exclude all evidence obtained from the search.

On appeal, the U.S. Supreme Court unanimously held that Riley had an expectation of privacy in the data in his cell phone.  In reaching this conclusion, the Court noted the immense storage capacity of a modern cell phone:

> The term "cell phone" is itself misleading shorthand; many of these devices are in fact minicomputers that also happen to have the capacity to be used as a telephone.  They could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers.
>
> * * *
>
> The most basic phones that sell for less than $20 might hold photographs, picture messages, text messages, Internet browsing history, a calendar, a thousand-entry phone book, and so on.
>
> * * *
>
> <u>A cell phone search would typically expose to the government far more than the most exhaustive search of a house</u>: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is.

<u>Riley</u>, 134 S. Ct. at 2489-91, 2014 U.S. LEXIS 4497, at 34 (emphasis added).  The Court therefore concluded that any search of a cell phone would require a warrant.  <u>Id.</u>, 134 S. Ct. at 2493.

This is the same conclusion reached by the FISC in 2007, when it refused to authorize the government's bulk collection of e-mail under FISA.  (App. 141-42, 168-87).

Thus, both the civil courts and the FISC have ruled against the government, when the government has sought to collect e-mail, texts and web queries without a warrant.

### B.    Defendants' conduct is an impermissible "general warrant."

In their pleadings filed with the FISC, Defendants have repeatedly emphasized their "internal controls" in accessing and searching the collected data.

However, these internal controls do not -- and will never -- work. The temptation to search the government's massive and growing database of private communications will inevitably lead to abuses of Defendants' unstable system. Political leaders will search the database for information about their opponents. NSA staffers will access the records of major law firms and investment banks for inside information concerning investments. Spurned lovers will use the database to cyber stalk the objects of their affection. The trade secrets of the Fortune 500 are at risk. The possibilities are limitless.

The key to the kingdom must be held by a third party, namely the courts. It should not be necessary to reinvent the wheel on this issue. History tells us the foreseeable result.

The United States constitution grew out of the governmental abuses common during the period from 1761 to 1791. This time period was characterized by

aggressive search and seizure practices that were the result of the "general warrant." A general warrant:

> empowered a person "to search in all places, where books were printing, in order to see if the printer had a license; and if upon such search he found any books which he suspected to be libelous against the church or state, he was to seize them, and carry them before the proper magistrate." [citation omitted]. Thus the general warrant became a powerful instrument  in proceedings for seditious libel against printers and authors.

Warden, Maryland Penitentiary v. Hayden, 387 U.S. 294, 313-314, 87 S. Ct. 1642, 1653-1654, 18 L. Ed. 2d 782, 796, 1967 U.S. LEXIS 2753, 34 (U.S. 1967). **A general warrant was, therefore, very similar to the power that the executive branch is attempting to seize from the Court in this case.**

In 1787, our present Constitution was drafted without a Bill of Rights.  The absence of a Bill of Rights became a significant source of concern during the ratification process.  There was much talk about general warrants, and the nation's fear of them.  Id.  Patrick Henry spoke out concerning the dangers of the situation, using words that are, ironically, still relevant today:

> The officers of Congress may come upon you now, fortified with all the terrors of paramount federal authority. . . .  They may, unless the general government is restrained by a bill of rights, or some similar restriction, go into your cellars and rooms, and search, ransack, and measure, every thing you eat, drink, and wear. They ought to be restrained within proper bounds.

Warden, Maryland Penitentiary, 387 U.S. at 316, 87 S. Ct. at 1655 (citing 3 Elliot's Debates 448-49).

During the ratification process, several states requested that the new Constitution be amended to provide protection against unjustified searches and seizures. In response, the first Congress proposed the Fourth Amendment, which became part of the Constitution in 1791.

The above history of the Fourth Amendment is important and relevant today. The dangers posed by Defendants' conduct are real. This is why some of the smartest people in the United States government – including William Binney and Edward Snowden – have sacrificed their careers and risked their liberty to bring this matter to the attention of this Court. This is why there was such an uproar in the West when the Snowden's disclosures became known in June 2013.

If the executive branch can seize all electronic communications without oversight, the power will be abused. As explained below, this is exactly what has occurred.

**C.    Defendants are incapable – by definition – of policing their own behavior.**

It is already known that Defendants are abusing their access to the stolen information. In March 2009, the FISC learned that NSA analysts were using the phone log database in ways that went beyond what the judges believed had been authorized. In a recent opinion, the Honorable John D. Bates, a former judge on the FISC,

admonished the NSA for repeatedly violating the requirements and limitations set forth

by Court Orders, privacy laws, and the U.S. Constitution.  As Judge Bates emphasized:

> Contrary to the government's repeated assurances, NSA has been routinely running queries of the metadata using querying terms that did not meet the standard for querying," and that this requirement had been "so frequently and systematically violated that it can fairly be said that this critical element of the overall . . . regime has never functioned effectively."[3]

Judge Bates further emphasized the NSA's unlawful conduct and egregious and

illicit surveillance tactics, by stating:

> The Court is troubled that the government's revelations regarding NSA's acquisition of Internet transactions mark the third instance in less than three years in which the government has disclosed a substantial misrepresentation regarding the scope of a major collection program.  In March, 2009, the Court concluded that its authorization of NSA's bulk acquisition of telephone call detail records from [redacted] in the so-called "big business records" matter "ha[d] been premised on a flawed depiction of how the NSA uses [the acquired] metadata," and that "[t]his misperception by the FISC existed from the inception of its authorized collection in May 2006, buttressed by repeated inaccurate statements made in the government's submissions. . . .[4]

---

[3] Charlie Savage and Scott Shane, "Secret Court Rebuked N.S.A. on Surveillance," The New York Times, (Aug. 21, 2013). http://www.nytimes.com/2013/08/22/us/201 I -rulingfound-an-nsa-program-unconstitutional.htm l?r0.

[4] Memorandum Opinion, In re Government's Ex Parte Submission of Reauthorization Certification and Related Procedures, Ex Parte Submission of Amended Certifications, and Request for an Order Approving Such Certification and Amended Certification (FISC Ct. Oct. 3. 2013), at fn. 14.

Defendants have continuously engaged in a pattern of non-compliance with respect to the FISC, as demonstrated through publicly released orders addressing NSA's surveillance.  In an opinion, dated August 29, 2013, the Honorable Claire V. Eagan wrote that "the Court is aware that . . . there have been incidents of non-compliance with respect to NSA's handling of produced information."[5]

Similarly, in an order issued by the FISC on March 2, 2013, the Honorable Reggie B. Walton held:

> In light of the scale of this bulk [telephone records] collection program, the Court must rely heavily on the government to monitor this program to ensure that it continues to be justified . . . and that it is being implemented in a manner that protects the privacy interests of U.S. persons as required by applicable minimization procedures.  To approve such a program, the Court must have every confidence that the government is doing its utmost to ensure that those responsible for implementation fully comply with the Court's orders.  **The Court no longer has such confidence.**

In Re Production of Tangible Things [Redacted], Dkt. No: BR. 08-13 (FISA Ct. March 2, 2009) (emphasis added).

Alarmingly, it has recently been discovered that NSA personnel have misused the NSA's surveillance power to spy on their former lovers.  NSA Inspector General George Ellard admitted that since 2003, there have been "twelve substantiated

---

[5] Amended Memorandum Opinion. In Re Application of the Federal Bureau of Investigation For An Order Requiring the Production Of Tangible Things From [Redacted], (FISC Ct. Aug. 29, 2013) at n.9.

instances of intentional misuse" of "surveillance authorities." <u>Nearly all of these cases involved an NSA employee spying on a girlfriend, boyfriend, or some kind of love interest.</u>[6]

If lower level employees are capable of such misuse of the agency's surveillance power, then imagine what the higher officials are capable of, with access to such surveillance programs.[4]

By attempting to collect all online documents, Defendants have made no attempt to comply with their Constitutional duty to narrow the sought-after records *to those records that pertain to an ongoing investigation or that have some indication of suspicious activity.* Defendants' activities do not differentiate between individuals that the government has a legitimate interest in monitoring and those that it does not.

> **D.    <u>The government's vast collection program is *per se* is unreasonable under the Fourth Amendment.</u>**

Finally, Defendants' surveillance program is *per se* unreasonable under the Fourth Amendment.

According to the U.S. Supreme Court, "the ultimate touchstone of the Fourth Amendment" is "reasonableness." <u>Brigham City v. Stuart</u>, 547 U.S. 398, 403 (2006). Reasonableness is determined by examining the "totality of circumstances" to "assess,

---

[6] Jake Gibson, "Too tempting? NSA watchdog details how officials spied on love interests," FOX News, (Sept. 27, 2013). http://www.foxnews.com/ politics/2013/09/27/too-tempting-nsa-details-how-officials-spied-on-love-

on the one hand, the degree to which [government conduct] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." Samson v. California, 547 U.S. 843, 848 (2006); see also Virginia v. Moore, 553 U.S. 164, 169 (2008).

In the context of electronic surveillance, reasonableness demands that statutes have "precise and discriminate" requirements and that the government's surveillance authority be "carefully circumscribed, so as to prevent unauthorized invasions of privacy." Berger, 388 U.S. at 58.

Defendants' dragnet collection of e-mail and online documents lacks any indicia of reasonableness, since it gives a handful of government employees unfettered access to the most private and intimate details of the nation's citizen's and business enterprises. This includes communications concerning the nation's health records, bank accounts, trade secrets, and relationships.

---

interests.

**III.    The Plaintiff has standing under federal case law because he has been specifically injured by Defendants' conduct.**

In its opinion, the District Court held that Schuchardt does not have standing to pursue this matter. It is proper for the Court to overrule this conclusion for the reasons set forth below.

To establish Article III standing, an injury must be "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." Clapper v. Amnesty Int'l USA, 133 S. Ct. 1138, 1140; 185 L. Ed. 2d 264, 269; 2013 U.S. LEXIS 1858, *4 (2013).

Traditionally, the federal courts used a system of "notice pleading," to determine the sufficiency of a complaint. This meant that the plaintiff simply had to give the defendant sufficient information as *to the nature of the causes of action* being pled against the defendant. The plaintiff did not have to include any specific facts in the complaint, at all. Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).

In 2007, the U.S. Supreme Court stated that a complaint must contain sufficient facts to show that the plaintiff was "plausibly" damaged by the defendant. In Bell Atlantic v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929, 940, 2007 U.S. LEXIS 5901 (2007).

In Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 2009 U.S. LEXIS 3472, 28-29 (2009), the Supreme Court elaborated on this standard:

> A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S., at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." [citations omitted].
>
> To survive a motion to dismiss, a complaint must contain sufficient factual matter, **accepted as true**, to "state a claim to relief that is plausible on its face." Id., at 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id., at 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929.

Iqbal, 556 U.S. at 678, 129 S. Ct. at 1949 (emphasis added).

Schuchardt has satisfied this standard for the reasons set forth below.

## A.    **Three federal circuit courts have held that plaintiffs have standing in collection cases, such as this case.**

First, several federal circuit courts have held that plaintiffs have standing in collection cases, such as this. Each of these cases is discussed below.

### 1)    **Ninth Circuit.**

In Jewel v. NSA, 673 F.3d 902, 2011 U.S. App. LEXIS 25951 (9th Cir. 2011), a group of citizens sued the NSA, objecting to the agency's collection of e-mail through a communication facility in the San Francisco area. In the case, several former NSA staffers came forward, and filed affidavits in support of the plaintiffs. Schuchardt has filed affidavits from these same staffers in the case at bar.

The District Court in <u>Jewel</u> initially found that the plaintiffs did not have standing. However, on appeal, the Ninth Circuit found that the plaintiffs *had standing* to challenge the government's collection of e-mail. In reaching this conclusion, the court <u>*rejected*</u> the government's contention that there is heightened standing requirement in national security cases:

> Article III imposes no heightened standing requirement for the often difficult cases that involve constitutional claims against the executive involving surveillance. See Amnesty Int'l, 638 F.3d at 149 ("We do not see any reason why the law of standing should be stricter or different in the surveillance context.").

<u>Jewel</u>, 673 F.3d at 913, 2011 U.S. App. LEXIS 25951, 25.

### 2)    <u>Second Circuit.</u>

The U.S. Court of Appeals for the Second Circuit reached a similar conclusion in <u>ACLU v. Clapper</u>, 785 F.3d 787, *801; 2015 U.S. App. LEXIS 7531, **27 (2d Cir. 2014).

In that case, the American Civil Liberties Union filed suit to enjoin the government's collection of telephone metadata. The trial court, sitting in the Southern District of New York, found that the ACLU *had standing* to challenge the government's collection activities. <u>ACLU v. Clapper</u>, 959 F. Supp. 2d 724, 738, 2013 U.S. Dist. LEXIS 180863, 29, 2013 WL 6819708 (S.D.N.Y. 2013).

The facts of that case were *identical* to this case. In both the ACLU case and the case at bar, the plaintiff has objected to the government's collection of telephone

metadata, and cited the FISC's order to Verizon as proof of the collection activities.

(App. 48, 99-100).

On appeal, the U.S. Court of Appeals for the Second Circuit affirmed, and found

that the ACLU had standing to challenge the government's collection of metadata.  The

Court explained its reasoning as follows:

> <u>Appellants in this case have . . . established standing to sue</u>, as the district court correctly held. Appellants here need not speculate that the government has collected, may in the future collect, their call records. . . .  It is not disputed that the government collected telephone metadata associated with the appellants' telephone calls. The Fourth Amendment protects against unreasonable searches and seizures. Appellants contend that the collection of their metadata exceeds the scope of what is authorized by § 215 and constitutes a Fourth Amendment search. . . .  Whether or not such claims prevail on the merits, appellants surely have standing to allege injury from the collection, and maintenance in a government database, of records relating to them.

<u>ACLU v. Clapper</u>, 785 F.3d 787, *801; 2015 U.S. App. LEXIS 7531, **27 (2d Cir.

2014) (emphasis added).

## 3)    <u>D.C. Circuit.</u>

The Court of Appeals for the District of Columbia has also found standing, in a

case identical to this case.  In <u>Klayman v. Obama</u>, 957 F. Supp. 2d 1, 27, 2013 U.S.

Dist. LEXIS 176925, 67-68, 2013 WL 6571596 (D.D.C. 2013), several private citizens

sued the federal government, seeking an injunction on the government's collection of

telephone metadata.  The District Court Judge, the Honorable Richard Leon, found that

the plaintiffs had standing:

> Put simply, the Government wants it both ways. Virtually all of the
> Government's briefs and arguments to this Court explain how the
> Government has acted in good faith to create a comprehensive
> metadata database that serves as a potentially valuable tool in
> combating terrorism — in which case, the NSA must have
> collected metadata from Verizon Wireless, the single largest
> wireless carrier in the United States, as well as AT&T and Sprint,
> the second and third-largest carriers.

Klayman, 957 F. Supp. 2d at 27, 2013 U.S. Dist. LEXIS 176925, at 67-68.  Judge

Leon therefore rejected the government's reasoning, and found that the plaintiffs had

standing.

On appeal, a plurality of justices on the D.C. Circuit agreed that the plaintiffs

had standing, at least for purposes of limited discovery to determine whether the

plaintiffs' records were being collected by the government.  Obama v. Klayman, 800

F.3d 559, 2015 U.S. App. LEXIS 15189 (D.C. Cir. 2015) ("On remand it is for the

district court to determine whether limited discovery to explore jurisdictional facts is

appropriate.").

The federal circuit courts are therefore attuned to the dangers posed by

Defendants' conduct, and are engaged on these issues.  It is therefore proper for the

Court to find that Schuchardt has standing in this case.

### B.    <u>The trial court erred in its interpretation of the above cases</u>.

In her opinion, Judge Bissoon found that this case is not sufficiently similar to the cases, discussed above, that have found standing to sue. (App. 17-18). It is proper for the Court to overrule this conclusion for several reasons.

<u>First</u>, the Plaintiffs pleadings are based on *the exact same documents* as the cases in the other circuits. The Plaintiff has filed affidavits from the same former NSA staffers filed in the Ninth Circuit *Jewel* case. (App. 107-133). He has also filed the same FISC order (directed to Verizon) used in the *Klayman* case (in the D.C. Circuit) and the *ACLU* case (in the Second Circuit). (App. 48). The allegations in this case are therefore *identical* to those in the Second Circuit, Ninth Circuit and D.C. Circuit, which found that plaintiffs have standing to challenge the government's collection of data.

<u>Second</u>, contrary to the above cases, the Plaintiff's allegations are, in general, *<u>more specific</u>*. The above collection cases were concerned largely with the collection of relatively-benign telephone metadata. This case challenges the holy grail of the government's collection efforts – the full content of the nation's e-mail database.

Schuchardt's complaint and related pleadings include, literally, a cornucopia of detail and facts describing Defendants' industrial-scale collection efforts.

The complaint quotes at length from affidavits filed by former NSA employees in the case of <u>Jewel v. NSA</u>, pending in the U.S. District Court for the Northern

36

District of California, Case No. 08-cv-04373 (the "Jewel case"). Those affidavits, based on personal information, indicate that the NSA is collecting the full-content of e-mail, without any oversight by the Courts. (App. 80-81).

The complaint next quotes at length from public statements made by former NSA employee, Edward Snowden. Snowden states that he was able to read the e-mail of any person in the United States – without a warrant – if he had the e-mail address for that person. (App. 86-87). Snowden's public statements make it abundantly clear that Defendants are collecting the full content of e-mail from a variety of e-mail providers in the United States. Id. Snowden has released documents showing *the actual dates* that the Defendants started such collection, with respect to a variety of e-mail providers. (App. 84-85).

The complaint also describes the government's treatment of Ladar Levinson, the owner of the Lavabit e-mail system. Following Snowden's disclosures, the federal government required Levinson make available the *full-content* of the e-mail within Lavabit's system – for over 400,000 subscribers. (App. 70-71). Levinson responded by shutting down the system, and then suing the federal government for the right to tell his story. The complaint describes Levinson's treatment by the government, and attaches a copy of Levinson's public statement. (App. 87-88).

All of these people are still alive today, and are available to testify. Based on the overwhelming evidence cited in the complaint, one cannot plausibly conclude that the

allegations in this case are wrong, or vague.  In fact, Schuchardt's allegations are unchallenged by the government.

For the foregoing reasons, it is proper for the Court to follow the precedents in the Second, Ninth and D.C. Circuits, and find that the Plaintiff has standing.

**C.    The complaint properly pleads injury caused by Defendants' unauthorized seizure of e-mail and web search queries.**

Next, the complaint properly pleads that the Plaintiff has been harmed by the Defendants' collection efforts.

The complaint states that Schuchardt uses the e-mail services provided by Google, Yahoo and Facebook.  (App. 95).  The complaint also states that Schuchardt uses the internet-search services used by Google; the cloud storage services provided by Google and Dropbox; and the cell phone and text services provided by Verizon. Id.; see also App. 190, ¶¶ 10-12.  The complaint is crystal clear on these points:

> 92.    Since March 12, 2006, the Defendants have been collecting both the content and the metadata of the Plaintiffs' private e-mail communications sent through the Yahoo e-mail system.

> 93.    Since January 14, 2009, the Defendants have been collecting both the content and the metadata of the Plaintiffs' private e-mail communications sent through the Google "gmail" e-mail system.

> 94.    Since January 14, 2009, the Defendants have been collecting the content and the metadata of the Plaintiffs' private internet search history through the Google search website.

> 95.    Since June 3, 2009, the Defendants have been collecting the content of the Plaintiff's e-mail and instant messages through Facebook.

96.    Upon information and belief, since approximately June 2013, the Defendants have been <u>collecting the content and metadata of documents stored by the Plaintiff</u> using the Dropbox cloud storage service.

97.    The documents, images and communications collected by the Defendants contain information of a private and confidential nature.  Such communications include bank account numbers; credit card numbers; passwords for financial data; health records; and trade secrets of a confidential and valuable nature.

98.    The documents and communications collected by the Defendants also include communications with clients of Schuchardt's law firm, which are privileged and confidential under applicable law.

99.    Upon information and belief, the Defendants are storing such information in a computer database, or through a government program, which the Defendants call "Prism."

(App. 96) (emphasis added).

Furthermore, the Plaintiff has properly pled that he has been harmed by the

Defendants' invasive conduct.  Specifically, the complaint states as follows:

106.    The Plaintiff is aggrieved by the above-described conduct of the Defendants.

107.    The Defendants are subject to the law established by the United States Constitution.

108.    According to the 4th Amendment of the United States Constitution:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

109.   The Plaintiff has an expectation of privacy in the above-described private information and electronic communications being collected by the Defendants.

110.   The Defendants have unlawfully collected such information in violation of the 4th Amendment, without obtaining a warrant and without probable cause.

\* \* \*

129.   The Defendants have already compromised, or caused the termination of, all secure e-mail communication services based in the United States.

130.   Upon information and belief, the Defendants have also compromised the security of the cloud storage services, Dropbox and Microsoft's Skydrive.

131.   Given the dearth of secure, alternative e-mail and cloud storage services available in the United States, the Plaintiff respectfully seeks injunctive relief against the Defendants.

\* \* \*

136.   The Plaintiff is no longer able to freely express himself by means of e-mail or documents stored by means of internet cloud services because the Defendants are collecting and data-mining such documents.

137.   In preparing this complaint, the Plaintiff was not able to use e-mail to consult with certain persons, even though the proposed communications would be entirely lawful.  This is because the Defendants could provide such communications directly to the lawyers representing the government in this lawsuit.

138.   The Defendants have also interfered with the Plaintiff's ability to freely associate with other persons, because the Defendants have unilaterally obtained, without a warrant, phone and internet data showing with whom the Plaintiff associates.

139.  If the Defendants' conduct is allowed to continue, it is
possible that future American governments will use such
information to blackmail or target political enemies.

(App. 97-87, ¶¶ 106-110, 136-139) (emphasis added).

The Plaintiff has further supplemented these allegations by means of an

Affidavit, filed together with this brief.  (App. 189).

For the foregoing reasons, the Plaintiff respectfully requests that the Court find

that the Plaintiff has standing to pursue this case.

## IV.   It is proper for the Court to grant a preliminary injunction.

In the complaint, Schuchardt is seeking a preliminary injunction against the

government's collection of his e-mail, while this case is pending.

To obtain injunctive relief, the Plaintiff must show a combination of four

factors:  (1) a likelihood of success on the merits; (2) that he will suffer irreparable

harm if the injunction is denied; (3) that granting preliminary relief will not result in

even greater harm to the non-moving party; and (4) that the public interest favors such

relief.  Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 708, 2004 U.S. App. LEXIS

10165, 15, 70 U.S.P.Q.2D (BNA) 1874 (3d Cir. 2004); Allegheny Energy, Inc. v.

DQE, Inc., 171 F.3d 153, 158 (3d Cir. 1999).

According to this Court, none of these factors is determinative.  Checkpoint

Sys., Inc. v. Check Point Software Techs., Inc., 269 F.3d 270, 280 (3d Cir. 2001).

Each factor is "weighed separately," which "is not to say that all factors must be given

equal weight." <u>Fisons Horticulture, Inc. v. Vigoro Indus., Inc.</u>, 30 F.3d 466, 476 & n.11 (3d Cir. 1994).  "The different factors may . . . be accorded different weights depending on the particular factual setting.

"If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." <u>CityFed Financial Corp. v. Office of Thrift Supervision</u>, 58 F.3d 739, 747 (D.C. Cir. 1995).  A district court should utilize the factors that seem appropriate to a given situation." <u>Kos Pharms., Inc.</u>, 369 F.3d at 732.

It is proper for the Court to grant a preliminary injunction in this case for the reasons set forth below.

### A.    <u>The Plaintiff is likely to succeed on the merits.</u>

To demonstrate a likelihood of success on the merits, a "plaintiff need only prove a *prima facie* case, not a certainty that he or she will win." <u>Highmark, Inc. v. UPMC Health Plan, Inc.</u>, 276 F.3d 160, 173 (3d Cir. 2001).  "Likelihood of success" means that a plaintiff has "a reasonable chance, or probability, of winning." <u>Singer Mgmt. Consultants, Inc. v. Milgram</u>, 650 F.3d 223, 229 (3d Cir. 2011) (en banc). It "does not mean more likely than not." <u>Conestoga Wood Specialties Corp. v. Sec'y of the United States HHS</u>, 724 F.3d 377, 397, 2013 U.S. App. LEXIS 15238, 56, 121 Fair Empl. Prac. Cas. (BNA) 66, 2013 WL 3845365 (3d Cir. Pa. 2013).

In this case, the Plaintiff has a likelihood of success on the merits for the following reasons.

### 1.   The Defendants' program directly violates the Fourth Amendment of the U.S. Constitution.

The Defendants' collection program violates the Fourth Amendment for the reasons stated *supra*, in Section II of this brief.

### 2.   The Defendants' program directly violates the First Amendment of the U.S. Constitution.

The Defendants' collection program also violates the First Amendment of the U.S. Constitution.  The First Amendment provides as follows:

> Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof or abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. 1st Amend. (2015).

By collecting and monitoring the nation's private communications, the Defendants have placed a severe burden on free speech and assembly in the United States.

The U.S. Supreme Court has recognized the chilling effect of government surveillance on First Amendment rights, given their potential to stifle free speech and association. The courts have therefore used "exacting scrutiny" when they consider governmental programs that burden First Amendment Rights.  <u>In re Grand Jury</u>

Proceedings, 776 F.2d 1099, 1102-03 (2d Cir. 1984); Clark v. Library of Cong., 750 F.

2d 89, 94 (D.C. Cir. 1984).

Under this demanding standard, **the government is required to show** that its

investigative methods are the *least restrictive means* of pursuing a "compelling state

interest." Clark, 750 F.2d at 95. "This type of scrutiny is necessary even if any

deterrent effect on the exercise of First Amendment right arises, not through direct

government action, but indirectly as an unintended but inevitable result of the

government's conduct," Elrod v. Burns, 427 U.S. 346, 362 (1976) (quoting Buckley v.

Valeo, 424 U.S. 1, 65 (1976); see also Bates v. City of Little Rock, 361 U.S. 516, 523

(1960) ("Freedoms such as these are protected not only against heavy-handed frontal

attack, but also from being stifled by more subtle governmental interference.")

The Supreme Court has frequently emphasized the importance of preserving the

First Amendment rights of advocacy groups. See, e.g., Gibson v. Florida Legislative

Investigation Committee, 372 U.S. 539, 892 (1963) ("The First and Fourteenth

Amendment rights of free speech and free association are fundamental, highly prized

and need breathing space to survive.").

The facts of this case are similar to those in NAACP v. Alabama ex rel.

Patterson, 357 U.S. 449 (1958). In that case, the Supreme Court invalidated an

Alabama order that would have required the NAACP to disclose its membership list.

The Supreme Court explained its reasoning as follows:

It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute an effective restraint on freedom of association . . . . This Court has recognized the vital relationship between freedom to associate and privacy in one's association. . . . <u>Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association</u>, particularly where a group espouses dissident beliefs.

<u>Id</u>. at 462 (emphasis added).  The U.S. Supreme Court therefore recognized that the government has no business keeping track of who one calls, and how frequently, as is occurring in this case.

Thus, the Defendants' bulk collection of e-mail and mass call-tracking program places a substantial burden on free speech, as it allows the government to access, review and monitor the Plaintiff's private communications.  The program is therefore in direct violation of the First Amendment.

### 3. <u>The Defendants' collection program is not authorized under Section 215 of the Patriot Act</u>.

In their pleadings, the Defendants claim that their bulk collection programs are authorized by the FISC under Section 215 of the Patriot Act.

The government's position faces several problems.

<u>First</u>, it is highly questionable that the FISC has authorized the Defendants' bulk collection of *e-mail* pursuant to Section 215 of the Patriot Act.  As explained *supra* in the Background Section of this brief, the FISC *denied* the government's motion to collect e-mail in bulk in January 2007.

<u>Second</u>, even if the government's collection programs were authorized by the FISC, the constitutional provisions discussed above would render any of its decisions unconstitutional, because the provisions of Section 215 of the Patriot Act conflict with the plain meaning of the First and Fourth Amendments.  <u>See</u> <u>Marbury v. Madison</u>, 5 U.S. 137, 177, 2 L. Ed. 60, 73, 1803 U.S. LEXIS 352, 70-71, 1 Cranch 137 (1803) ("It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it.").

<u>Third</u>, as explained below, the plain meaning of Section 215 does not authorize the government's highly-intrusive bulk collection programs.

### a.    **The Defendant's open-ended bulk collection programs violate the plain meaning of Section 215 of the Patriot Act.**

Section 215 of the Patriot Act allows the government to obtain an order from the FISC requiring the production of "any tangible things" upon a:

> showing that there are **reasonable grounds** to believe that the tangible things sought ***are relevant to an authorized investigation*** . . . to obtain foreign intelligence information not concerning a United States person or to protect against international terrorism or clandestine intelligence activities.

50 U.S.C. § 1860 (2015) (emphasis added).

The government's mass surveillance program far exceeds the authority provided by Section 215, for the reasons set forth below.

First, Section 215 authorizes the production of information that is "relevant" to an authorized investigation. Id. The government's mass surveillance program is *not presently relevant* to any authorized investigation.

Second, Section 215 requires "reasonable grounds" before information may be produced. Id.

"Reasonable grounds" has been often treated as equivalent to "reasonable suspicion." See, e.g., United States v. Banks, 540 U.S. 31, 36, (2003); United States v. Henley, 469 U.S. 221, 227 (1985). Reasonable suspicion requires a showing of ***"specific and articulable facts,*** which -- taken together with rational inferences from those facts -- reasonably warrant" intrusion into a suspect's privacy. Terry v. Ohio, 392 U.S. 1, 21 (1968).

In this case, the Defendants do not have "specific and articulable facts" for seizing the nation's e-mail database without a warrant. Rather than limit its surveillance to a certain group of people that are the subjects of an "authorized investigation," the government is instead collecting every e-mail sent in the United States and information about virtually every phone call made or received in the United States.

It is simply inconceivable to conclude that all e-mail sent in the United States bears some relevance to an investigation based on "specific and articulable facts." Nor

are there any reasonable grounds to believe that such information may be relevant to an authorized investigation, in any conventional sense of that phrase.

To the contrary, common sense and logic dictate that the vast majority of the e-mail records obtained through this program are, in fact, **not relevant** to any authorized investigation. The government has not, and cannot, demonstrate, through specific and articulable facts, that the indiscriminate, unfettered, bulk collection of hundreds of millions of Americans' e-mails and call records is a warranted and justified intrusion on privacy rights.

For the foregoing reasons, the Defendants have exceeded the bounds of their authority under Section 215 of the Patriot Act.

### B. The Plaintiff will suffer irreparable harm if preliminary relief is withheld.

The Plaintiff will also suffer irreparable harm if an injunction is not granted in this case. "Irreparable harm is injury for which a monetary award cannot be adequate compensation." Int'l Dairy Foods Ass'n v. Amestoy, 92 F.3d 67, 71 (2d Cir. 1996).

"It is well-established that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Hohe v. Casey, 868 F.2d 69, 72 (3d Cir. 1989) (quoting Elrod v. Burns, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976)). In fact, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable

injury is necessary." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995). <u>Conestoga Wood Specialties Corp.</u>, 724 F.3d at 416, 2013 U.S. App. LEXIS 15238, 121-122 (3d Cir. Pa. 2013). <u>See also Seretse-Khama v. Ashcroft</u>, 215 F. Supp. 2d 37, 53 (D.D.C. 2002) (deprivation of constitutional protection "is an undeniably substantial and irreparable harm").

In this case, the Plaintiff is asserting injuries relating to his rights of expression under the First Amendment and his right to litigate this case without interference under the Fourth Amendment. Without a preliminary injunction, Defendants would inherently have a significantly greater and substantially unfair advantage in this lawsuit, especially during the pendency of this action. This would permanently deprive the Plaintiff of their right to a fair trial.

Defendants' collection programs are particularly troubling, given Plaintiff Schuchardt's profession as an attorney advocating for the protection of civil rights and liberties. Defendants' surveillance program inherently -- and by definition -- collects all of the Plaintiff's e-mail communications to persons working with him on this case. Without an injunction, the Defendants will therefore have advance notice of the Plaintiff's legal strategies concerning this and other cases.

The government engaged in similar mischief in the case of <u>United States v. Ellsberg</u>. In that case, the federal government brought criminal charges against Daniel

Ellsberg for leaking the Pentagon Papers to the media. During the course of the trial, it was learned that the federal government had illegally obtained information concerning Ellsberg's defense, without a warrant. On May 11, 1973, the U.S. District Court for the Central District of California dismissed all charges against Ellsberg, due to the government's misconduct.[7]

### C.    Issuance of a preliminary injunction will *not* substantially injure the Defendants.

In contrast to the substantial harm facing the Plaintiff, there can be no credible claim of harm to the Defendants. The Defendants cannot be said to be "burdened" by a requirement *to comply with the law*. The Defendants are already defending against constitutional challenges to its mass call tracking surveillance program, both in court and in Congress. Unless and until such challenges are resolved, the Defendants should not be permitted to continue its highly-intrusive surveillance tactics and collection of vast quantities of communication records, particularly where, as here, there are legitimate questions of agency overreach. If the Court grants the preliminary injunction, the Defendants simply will have to wait until such challenge is resolved before continuing any surveillance of the Plaintiff.

---

[7] Judge William Byrne; Ended Trial Over Pentagon Papers". Washington Post: C09. January 15, 2006.

**D.**    **The balance of harm and the public interest supports the grant of a preliminary injunction**.

This brief has already discussed the interest of the general public in its discussion of the evils of general warrants.  See *supra*, at 14-15.

However, there are other reasons for granting an injunction.  The public interest prong is also met because "there is an overriding public interest . . . in an agency's *faithful adherence* to its statutory mandate." Jacksonville Port Auth. V. Adonis, 556 F.2d 52, 59 (D.C. Cir. 1977).  See also In re Medicare Reimbursement Litigation, 414 F.3d 7, 12 (D.C. Cir. 2005) (Additional administrative burden "[would] not outweigh the public's substantial interest in the Secretary's following the law.").

Given the Defendants' fundamental inability to comply with court orders and their substantially likely constitutional violations, the public interest will be served if this court preliminarily enjoins the Defendants from continuing their warrantless, unlawful mass collection programs.  See, e.g., Tyndale House Publishers, Inc. v. Sebelius, 904 F. Supp. 2d 106, 130 (D.D.C. 2012) (holding that "there is undoubtedly . . . a public interest in ensuring that the rights secured under the First Amendment. . . are protected"); O'Donnell Const. Co. v. District of Columbia, 963 F.2d 420, 429 (D.C. Cir. 1992) (holding that "issuance of a preliminary injunction would serve the public's interest in maintaining a system of laws" free of constitutional violations). See also Seretse-Khama v. Ashcroft, 215 F. Supp. 2d 37, 54 (D.D.C. 2002) (holding

that the public interest is served by a court order that avoids "serious constitutional risks"); <u>N. Mariana Islands v. United States</u>, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) (noting "the general public interest served by agencies' compliance with the law"); <u>Cortez III Serv. Corp. v. Nat'l Aeronautics & Space Admin.</u>, 950 F. Supp. 357, 363 (D.D.C. 1996) (public interest served by enforcing constitutional requirements).

## CONCLUSION

This case poses significant policy questions for the United States, as a nation.

For the first time in history, a small group of persons in the federal government has gained access to virtually all of the nation's online communications and documents. This seizure of private data gives Defendants enormous power. It is the power to pry through the papers in our citizens' homes. It is the power to blackmail the citizenry. It is the power to blackmail the judiciary.

According to the United States constitution, the power to seize information from private persons was assigned to the *courts,* as part of our system of limited government. U.S. Const. Art. III, Sec. 1. If the executive branch usurps this power, then the courts inevitably lose out in the balance of power. In addition, the nation loses the objectivity previously provided by a separation of powers.

Seventy-five years ago, Justice Felix Frankfurter warned the American people of the importance of this amendment:

This Court has thus far jealously enforced the principle of a free society secured by the prohibition of unreasonable searches and seizures. . . .  It is not only under Nazi rule that police excesses are inimical to freedom. It is easy to make light of insistence on scrupulous regard for the safeguards of civil liberties when invoked on behalf of the unworthy. It is too easy. History bears testimony that by such disregard are the rights of liberty extinguished, *heedlessly at first*, then stealthily, and brazenly in the end.

Davis v. United States, 328 U.S. 582, 597, 66 S. Ct. 1256, 1263, 90 L. Ed. 1453, 1462,

1946 U.S. LEXIS 2180, 23-24 (1946) (emphasis added).

Let us heed his words, while there is still time to do so.

\* \* \*

WHEREFORE, for the reasons set forth above, the Plaintiff respectfully requests that this Honorable Court enter an order finding that the Plaintiff has standing to pursue this case, and granting a preliminary injunction prohibiting Defendants from collecting the Plaintiff's e-mail and web queries without a warrant issued by a neutral and detached magistrate.

Respectfully submitted,

By: /s/ Elliott J. Schuchardt
    Elliott Schuchardt
    PA I.D. #78911

SCHUCHARDT LAW FIRM
309 Braeburn Drive
Winchester, VA 22601
Phone:  (540) 409-8993
E-mail:  elliott016@gmail.com

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE
## REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because this brief contains 11,491 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word in 14 point Times New Roman font.

## CERTIFICATE OF COMPLIANCE
## WITH LOCAL RULE 31.0

1.    I hereby certify that the text of the electronic brief submitted in this case is identical to the text in the paper copies filed with the Court.

2.    I hereby certify that the WebRoot Secure Anywhere virus detection program has been run on the electronic file for this brief and that no virus was detected.

/s/ Elliott Schuchardt
Elliott Schuchardt